**Pamela A. Covella**, no. 007681
5525 E. Lincoln Drive, Suite 99
Paradise Valley, Arizona  85253
Telephone (480) 797-7024
Facsimile: (480) 247-4794
Email: pamela@covellalaw.com
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Todd R. White, an Arizona resident; | No.: |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Federal National Mortgage Association, a Federal Government Sponsored Enterprise dba "Fannie Mae"; IBM Lender Business Process Services, Inc., a Delaware corporation; TD Service Company of Arizona, Inc., a California corporation; MetLife Home Loans, a division of MetLife Bank, National Association, domiciled, upon information and belief in Delaware; and First Tennessee Bank N. A, a National Association and citizen of the State of Tennessee (dba "First Horizon Home Loans"), a wholly owned subsidiary of First Horizon National Corporation Inc., a Tennessee Corporation; | (INJUNCTIVE RELIEF SOUGHT) (JURY TRIAL DEMANDED) |
| Defendants. | |

Plaintiff Todd R. White, by and through undersigned counsel, for his

Complaint against Defendants, alleges:

## JURISDICTION AND VENUE

1.      This Court has diversity jurisdiction over Plaintiff White's claims pursuant to Title 28 U.S.C. § 1332 in that Plaintiff White is a resident of Arizona, and all defendants are citizens of states other than Arizona and the amount in controversy exceeds seventy five thousand dollars ($75,000.00).

2.      This action is brought to remedy damages caused to Plaintiff Todd R. White ("Plaintiff White") by certain Defendants under common law claims of breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel and negligent misrepresentation,  and under the following federal statutes that each provide explicit rights to private claims by consumers and jurisdiction for those claims in U. S. District Courts: the Fair Credit Reporting Act, 15 U.S.C. §1681 *et seq.* ("FCRA"); and Real Estate  Settlement Procedures   Act 12 U.S.C. §2605 *et seq.* ("RESPA").

3.      This Court has supplemental jurisdiction over Plaintiff White's state law claims pursuant to 28 U.S.C. §1367(a) as they arise out of the same facts as the federal claim and both claims form part of the same case or controversy under Article III of the United States Constitution. Injunctive relief, damages and other appropriate legal and equitable relief is sought under common law claims.

4.      As the unlawful acts complained of herein occurred within Maricopa County, Arizona venue is proper in this District Court.

**PARTIES**

5.      Plaintiff White is a single man who currently resides in Maricopa County, Arizona. He is the sole custodial parent of three minor children. His full-time primary occupation is in classified law enforcement; he has been employed by the same agency, in

advancing positions, for twenty-three years; he has been the recipient of the highest awards and honors in his field, and is highly regarded among his colleagues for his work ethic, talents and integrity. (White Affidavit, Exhibit 1). Upon information and belief Defendant First Horizon Home Loans, is a division of First Tennessee Bank N. A, a National Association and a citizen of the State of Tennessee. Upon information and belief First Tennessee Bank, N.A. is a wholly owned subsidiary of First Horizon National Corporation, a Tennessee corporation ("Defendant First Horizon"). [1]

6.    Upon information and belief, the entity doing business as "Defendant MetLife Home Loans, a division of Defendant MetLife, Bank N.A." is a national association and a wholly-owned subsidiary of Defendant MetLife, Inc., a citizen of the State of Delaware. [2]

---

[1] Plaintiff has named as defendants and intends to serve process on both First Tennessee Bank, N.A. and First Horizon National Corporation, Inc.. Plaintiff will seek to amend or voluntarily dismiss claims alleged herein as to either entity if discovery reveals facts concerning the identity and/or citizenship of "First Horizon" affiliates such that amendment or voluntary dismissal is warranted.

[2] Upon information and belief MetLife Bank, N.A. conducted business activity in the State of Arizona by acquiring ownership of mortgages recorded Arizona real property and conducted loan servicing activities in Arizona, however Plaintiff found no record of MetLife Bank, N.A. or MetLife, Inc. registering to do business in Arizona at the Arizona Corporation Commission. If discovery reveals that MetLife was not registered to do business in Arizona at the time of the events alleged herein, Plaintiff submits that it will be necessary to "pierce the corporate veil" and add as defendants those officers, directors, employees or agents of MetLife involved or in control of its activities in Arizona. Plaintiff has named both MetLife entities as defendants and intends to serve process on both. Plaintiff will seek to amend or voluntarily dismiss claims alleged herein as to either entity if discovery reveals facts concerning MetLife's structure and authority such that amendment or voluntary dismissal is warranted.

7.      Defendant Federal National Mortgage Association is a Federal Government Sponsored Enterprise dba "Fannie Mae" ("Defendant Fannie Mae"). Upon information and belief Fannie Mae's principal place of business is in Washington, D.C.

8.      Defendant IBM Lender Business Process Services, Inc., is a Delaware corporation ("Defendant LBPS").

**FACTUAL BACKGROUND**

9.      On September 12, 2007 Plaintiff White and Defendant First Horizon entered into a mortgage loan agreement (the "Loan") for Plaintiff White's acquisition of his primary residence (the "Residence") pursuant to a promissory note (the "Note") secured by a deed of trust (the "Deed of Trust"), both executed by Plaintiff White on September 12, 2007, (the Note and Deed of Trust and accompanying Escrow Payment Letter are collectively referred to herein as the "Loan Documents"). (Note, Exhibit 2; Deed of Trust, Exhibit 3). The purchase price of the Residence was four hundred thousand ten dollars ($410,000.00) (fifty thousand dollars ($50,000.00) down payment ($39,638.60 to seller) (and a Note in the amount of three hundred ninety seven thousand dollars ($397,000.00)).

10.     Monthly payments were amortized at two thousand six hundred seventy nine dollars and thirty eight cents ($2679.38). A "Payment Letter" sets the estimated additional monthly escrow costs, including a monthly mortgage insurance policy premium payment of five hundred thirty three dollars and fifty eight cents ($533.58) for a policy premium insuring First Horizon for losses it might incur in the event of a default by Plaintiff White, as required by First Horizon, as a condition to entering into the mortgage agreement. The total monthly payment was three thousand, four hundred, thirty

eight dollars and sixty five cents ($3438.65). The payment was later raised to three thousand, five hundred, eighty eight dollars and fourteen cents ($3588.14) to address an escrow deficiency.

11.   The Deed of Trust was recorded on September 13, 2007 in the records of the Maricopa County Recorder's Office against the Residence. Plaintiff White and his three minor children have since occupied the home. No other loans have been secured by the Residence.

12.   Upon information and belief, on a date unknown to Plaintiff White, Defendant First Horizon appointed Mortgage Electronic Registration Systems, Inc., a Delaware corporation ("MERS"), as "nominee" and beneficiary under the Deed of Trust.

13.   Upon information and belief, on a date unknown to Plaintiff White, MERS's status as beneficiary under the Deed of Trust ended.  Defendant Fannie Mae is identified on a recently recorded Notice of Trustee's Sale ("Notice/TS") as beneficiary under the Deed of Trust. If upon discovery Plaintiff White determines that MERS's appointment as beneficiary was not valid or effective, and/or if Fannie Mae's substitution in as MERS' successor beneficiary was not valid or effective, and/or if MERS was not the holder of the Note when it was Beneficiary, or if Fannie Mae is not beneficiary *and* holder of the Note, Plaintiff White pleads in the alternative that Defendant Fannie Mae lacks standing to institute a trustee's sale against the Residence.

14.   Prior to the generally-recognized devastating real estate market downturn in 2008 and 2009 in Arizona and other parts of the country, Plaintiff White supplemented his income with overtime hours in his primary occupation; additionally, he supplemented his

employment salary by providing services in his off-duty hours relating to real estate related services in design and construction. The market downturn effectively negated demand for his outside design and construction related services, and caused his employer to institute a moratorium on overtime hours in the first quarter of 2009. Thus, by the second quarter of 2009, Plaintiff White's overall income was reduced by approximately thirty-five percent (35%) from the time he closed on the Loan Documents. Plaintiff White suffered additional economic hardship due to the default by certain of his construction-related clients on a significant amount in fees owed to him for services he had rendered over an 11 month period in 2008. With ensuing costly litigation attempts to recover those losses, he carried an even heavier burden; that litigation resulted in recovery of only a very small fraction of what he was owed.

15.     At the time of the precipitous drop in Plaintiff White's income, Plaintiff White fell past-due in his Note payments (March, April and May 2009). (The total of the three past-due payment is referred to herein as the "Arrearages"). At the time Plaintiff White became aware of media claiming that in response to the financial crises lenders were offering to cooperate with and provide assistance to borrowers suffering financial hardship as an alternative to foreclosures.[3]

---

[3] After retaining counsel in this action in August 2010, Plaintiff White became aware of the HAMP program. Plaintiff requests that this Court take judicial notice of that a federal HAMP program exists. Plaintiff respectfully takes liberty herein in summarizing the voluminous HAMP Guidelines without attaching them, not because he submits that the interpretation of the Guidelines are relevant or applicable, but because Defendants have taken the position in correspondence sent to Plaintiff White that the grounds for their refusal to perform under the contract at issue is based on HAMP, however HAMP Guidelines are not included in the subject contract as a condition to Defendants' performance. For a brief historical backdrop, so the Court is familiar with the acronym mentioned in Defendant MetLife's "denial" discussed discussion in this Complaint, Plaintiff submits the following summary with references to cited legislation and

16.     Without any awareness of the federal "HAMP" lender-incentive program, Plaintiff White visited the "Hope Now" website in April of 2009 and saw a link to the First Horizon's "Homeowner's Assistance Program." Form. Plaintiff White recalls no reference to HAMP or NPV on the "assistance" pages. A three page PDF application was available to print and complete.

The application text (in part) follows (*emphasis and styling in original*):

If you are having difficulty making your mortgage payments, <u>START HERE</u>!
***

---

the Guidelines: In correspondence 2008 the United States Treasury Department had contracted with certain financial institutions to allow them to receive billion of dollars in funds as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211, in exchange for their participate in a program known as the "Home Affordable Mortgage Program" ("HAMP') -- a program in which participating financial institutions (deemed "mortgage servicers") received bulk funding incentive payments for entering into agreements for mortgage modifications with eligible borrowers with the goal of avoiding foreclosures. Under HAMP, the Treasury Department issued guidelines to servicers ("Guidelines") specifying several "threshold criteria" to define the class of eligible borrowers: generally, if the borrower meets the threshold criteria, the Guidelines enumerate a sequence of steps (referred to as the "waterfall") that servicers could apply, in a prescribed order, to attempt to achieve a "target monthly mortgage payment," defined as 31 percent of the borrower's gross monthly income. The waterfall involves, in this sequence: (1) a determination of the total debt of the borrower after capitalizing certain costs (delinquent interest, taxes, insurance escrows, and third party fees) in the unpaid principal balance; (2) a reduction of the interest rate in increments down to a 2.0% floor; (3) an extension of the term and re-amortization of the loan by up to 480 months from the effective date of the modification; (4) a forbearance (but not forgiveness) on a portion of the principal; and (5) transformation of the forbearance into a balloon payment to be paid either at maturity or upon payoff. The Guidelines explain that "participating servicers are required to consider all eligible mortgage loans unless prohibited by the rules of the applicable [pooling and servicing agreement] and/or other investor servicing agreements," and that "[A]ll loans that meet the [HAMP] eligibility criteria and are either deemed to be in imminent default (as described above) or 60 or more days delinquent, must be evaluated using a standardized NPV [net present value] test" that compares the NPV result under a prospective modification to the NPV result without modification. If the NPV result for the prospective modification is greater than the NPV result without modification, the result is deemed 'positive' and the servicer must offer the modification. If the NPV result without modification is greater than the NPV result of the prospective modification , the modification result is deemed 'negative' and the servicer has the option of entering into the modification, considering other "work-out" solutions or making no changes,  in its discretion. (See, HAMP Guidelines,

The process is straightforward. First, we collect some background and financial information, using this form and the documents you send to us. Then, we'll attempt to match your situation with the program(s) available. Finally, <u>if we determine there is a program (or programs) you qualify for</u>, we will contact you to discuss the potential solutions and send out the required documents and legal agreements needed to complete the process.

*** 

On the following page you'll have an opportunity to tell us about your income and expenses. That will help us determine which programs we can offer you.

***

The information you send us will be evaluated and a specialist from our Loss Mitigation team will contact you. . .

17.     On April 4, 2010 Plaintiff White mailed the application (including a form "Financial Statement" and request for a description of the "financial difficulty you are facing.") along with current financial statements and supporting documents. A few weeks later he received a call from a First Horizon representative who enthusiastically reported that after evaluation of Plaintiff White's application and criteria he had been approved to proceed with modification.  The general nature of the conversation was that First Horizon Mortgage had evaluated his financial criteria and approved his eligibility for the modification program: the representative explained the "trial period" details and Plaintiff White received a distinct impression that if he showed good faith and performed according to trial terms, his loan would be permanently modified. The representative said the paperwork to complete the process would be sent soon. He never mentioned "HAMP" or "NPV" criteria.

18.     Thereafter, Defendant First Horizon and Plaintiff White entered into a written agreement entitled "Home Modification Trial Period Plan" (commonly referred to as a "TPP"). The term of the TPP was from July 2, 2009 until October 1, 2009 (the "TPP Term"). The effective date of the TPP is June 2, 2009. Plaintiff White signed the TPP on

June 06, 2009 and Defendant First Horizon signed the TPP on June 25, 2009.  (TPP, Exhibit 10).

19.    Under the TPP, in the *opening* sentence of the four page agreement, First Horizon agreed to provide a written permanent modification agreement ("PM") as follows:

"If I am in compliance with this Trial Period Plan (the "Plan") and my representations [financial condition] in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement") as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.

20.    The above two conditions (the "Conditions") are the only conditions precedent to Defendant's First Horizon's commitment to provide Plaintiff White with a permanent modification. TPP Page 3, Paragraph G, contains the following language:

G. I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of the Modification Agreement, and (iii) the Modification Effective Date has past.. . .I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Plan.

21.    Under the TPP, Plaintiff White's monthly mortgage payments were reduced from Three thousand, five hundred eighty eight dollars and fourteen cents ($3588.14) to two thousand, nine hundred sixty four dollars and sixty cents ($2964.60) and were due on the first day of each month on July, August and September 2009.

22.    Under the TPP, Defendant First Horizon agreed to apply the TPP payments to the Arrearages as follows:

"The Lender will hold the payments received during the Trial Period in a non-interest bearing payment until they total an amount that is enough to pay my oldest delinquent monthly payment on my loan in full. If there is any remaining money after such payment is applied; such remaining funds will be held by the Lender and not posted to my account until they total an amount that is enough to pay the next oldest delinquent monthly payment in full."

23.   Under the TPP Defendant First Horizon agreed that it would not institute foreclosure proceedings during the TPP Term if Plaintiff White was in compliance with the TPP.

24.   Plaintiff White has no knowledge as to whether Defendant First Horizons, MetLife, LBPS or Fannie Mae was or are qualified HAMP servicers. There was no intent expressed by Defendant First Horizon prior to or in the TPP to include conditions relating to HAMP or any other conditions not expressly stated in the TPP. Prior to and during the TPP Term, Plaintiff White had no knowledge of  HAMP, and no awareness of any "mortgage servicer" agreements between financial institutions and the U.S. Government, the HAMP Guidelines  "NPV" and "waterfall" criteria. Neither the TPP Application nor the TPP make reference to HAMP or HAMP criteria.

25.   The TPP was signed by the parties in the last week of June 2009, with an effective date of June 2. On June 4, 2008 a press release announced the following:

"MetLife Bank, N.A.  .  .has entered into an agreement to acquire the residential mortgage and servicing business of First Tennessee Bank, N.A.  .  .  .The acquisition includes all of the origination business.  .  .and servicing associated with approximately $20 billion of first lien mortgage loans [and] entering into a sub-servicing agreement for the remainder of First Horizon's first lien servicing portfolio which is expected to total.  .  .$65 billion after closing.  .  .In addition the acquisition will include more than 230 retail

and wholesale office nationwide.. . . The companies expect the transaction to be completed during the third quarter of 2008."

(MetLife Press Release, PAPI Exhibit 7). MetLife's President is quoted in the release as follows:

"This will significantly accelerate the growth potential of MetLife Bank's residential mortgage business as it allows us to acquire significant expertise, scale and platforms. Combined with our recently announced purchase of EverBank's reverse mortgage business, this acquisition effectively positions MetLife Bank to be a leader in the origination and servicing of mortgage products."

26.    Therefore, when the parties entered into the TPP the when closing of the of transaction to transfer ownership of Plaintiff White's Loan was pending between Defendants First Horizon and MetLife, although Plaintiff White had no notice of this impending closing.

27.    Plaintiff White satisfied all Conditions under the TPP thereby triggering Defendant First Horizon's obligation to enter into the PM. As the end of the TPP term was drawing near, in September 2009, Plaintiff White telephoned First Horizon's customer assistance number to request the PM documents. During the call he learned for the first time that Defendant MetLife had taken over as "servicer" of his mortgage. Thereafter during Plaintiff White's phone conversations with representatives of Defendants Horizon/Defendant MetLife from September 2009 through January 2010, Plaintiff White was told that due to the Defendant MetLife's assumption of First Horizon's loan servicing and the number of modifications being processed they were inundated and back-logged and that his PM was being processed and would be sent to him as soon possible. Defendants Horizon/Defendant MetLife's representatives instructed

Plaintiff White to continue to make payments on the first of each month in the same amount as the TPP payments, thus extending the TPP Term. Plaintiff White was assured by representatives that his credit record dispute would be noted and investigated.

28.     Upon information and belief, Defendant MetLife is Defendant First Horizon's successor-in-interest under the Loan Documents and TPP. If Defendant MetLife is indeed Defendant First Horizon's legal successor-in-interest, then Defendants First Horizon and MetLife are jointly and severally liable to perform under the terms of the Loan Documents and TPP; therefore, they are hereinafter referred to jointly as "Defendant First Horizon/MetLife."

29.     Starting with his first phone calls to Defendants Horizon/ MetLife in September 2010 through January 2010 to obtain the PM, Plaintiff White made repeated, desperate requests for correction of the destructive inaccurate credit report information. Plaintiff White repeatedly alerted Defendants Horizon/Defendant MetLife representatives to the fact that he was seeking new employment and/or promotions in an effort to increase his salary, and that due to the fact that his profession requires intensive federal security clearances, derogatory credit reports would likely cause severe damage by potentially precluding or delaying his prospective opportunities. During phone conversations with representatives of Defendants Horizon/Defendant MetLife from October 2009 through January 2010, was assured by told that his credit record dispute would be noted and reported.

30.     Defendants First Horizon/Defendant MetLife's promises induced a reliance and sense of security on Plaintiff White's part that there was no need to seek

alternative "workout" options with Defendants First Horizon/Defendant MetLife's or any other prospective financier (e.g., deed-in lieu of foreclosure, short sale, deed-lease, etc.) or to seek alternatives to his family's housing situation (e.g. rental of the Residence to a tenant and relocation of his family to a rental or leased property).

31.     Plaintiff White meticulously complied with the demands and instructions of Defendants Horizon/Defendant MetLife regarding made four additional timely and full TPP payments in October 2009 and on the first days of November and December 2009 and January 2010. Defendants Horizon/Defendant MetLife, on one hand, induced Plaintiff White to make additional TPP payments with rolling promises to work cooperatively to promptly provide the PM and to correct credit report information which they knew was in dispute and harmful to Plaintiff White's opportunities for improved financial stability. On the other hand, Defendants Horizon/Defendant MetLife had become a destructive adversary to Plaintiff White by sabotaging his credit reputation and employment opportunities and causing extreme foreseeable emotional distress and fear in the lives of Plaintiff White and his family.

32.     During third quarter of 2009, when Plaintiff White's Note payments were in arrears (March, April and May 2009) Defendants First Horizon/MetLife lawfully reported the past-due information to credit reporting agencies ("CRAs"). However, as discussed in Paragraph above, under the TPP, Defendants First Horizon/MetLife agreed to apply TPP payments to the Arrearages. By January, 2010, Plaintiff White had made $20,752.20 in TPP payments, enough to cover the entire Arrearages.

33.     Despite this obligation, and despite the repeated assurances of Defendants Horizon/Defendant MetLife, it failed to correct the inaccurate information to CRAs (or at a minimum report the information as "in dispute"). Defendants First Horizon/Defendant MetLife, while accepting Plaintiff White's timely payments under the TPP, repeatedly provided inaccurate information to CRAs by claiming varying and inconsistent false past due periods (90 to 120 days), falsely reporting the balance of the debt by failing to credit the TPP payments to the balance when they were made, and by failing to apply the TPP payments to arrearages as required under the TPP. This inaccurate information remains on Plaintiff White's credit report today despite a year-long battle for correction and repeated pleas to, at a minimum, report the information as "in dispute."

34.     In February Plaintiff White received a letter on Defendant MetLife's letterhead dated February 2 letter, informing him that the PM was denied because "…based on the NPV results the owner of your loan has not approved a modification."

35.     Prior to Defendants First Horizon/MetLife February 4 letter, neither Defendant s First Horizon/ MetLife ever made verbal or written reference to "NPV" criteria; the only criteria ever discussed with First Horizon/Defendant MetLife was the information First Horizon/Defendant MetLife requested and obtained from Plaintiff White in the pre-TPP application process regarding his then-current income and debt information and facts pertaining to the Loan. Upon review of said information, Defendant First Horizon/Defendant MetLife entered into the TPP with a commitment to provide a modification if the two Conditions were met.

36.    Thereafter, due to Defendants First Horizon/MetLife's failure to correct false credit information and its breach of the TPP by failing to provided the PM, Plaintiff White stopped making his monthly payments and continued with his quest to seek enforcement of the TPP to obtain the PM. Plaintiff White continued to persevere in a harrowing, stressful, frustrating and time-engulfing futile struggle to get through to the right official at Defendants First Horizon/MetLife.

37.    After receiving the MetLife "denial" letter Plaintiff White met with a representative of Radian Insurance, the mortgage insurance carrier on Plaintiff White's mortgage. Plaintiff White discussed with him the distressing frustration from the debacle of the TPP and his futile attempts for meaningful communication with Defendant MetLife. Plaintiff White informed the representative that he had not made the February or March 2010 payments due to Defendant First Horizon/MetLife breach, that Defendant First Horizon had provided false information to CRAs that was affecting his employability, and requested assistance in obtaining the PM and relief from Defendant First Horizon/MetLife's refusal to correct inaccurate credit reporting. The Radian representative assured Mr. White that Radian would review his case and assist him in his efforts to resolve the dispute with Defendant First Horizon/MetLife.

38.    Mr. White impressed upon the Radian representative that it was not his intention to avoid his financial responsibilities in regard to the mortgage, but to work on a solution where he could get back on track with his payments.

39.    The next day Radian entered an online registration of the dispute and sent an email requesting documentation from Mr. White (a "Loan Modification Application"

packet to Mr. White with instructions). Mr. White had explained to the Radian representative that he had a binding TPP contract to provide a PM; regardless, he complied with the Radian instruction as possible method for to obtain the already-committed PM and sent the documentation to Radian.

40.    On February 14, 2010 Plaintiff White submitted a written notice of the credit dispute with of Defendants Horizon/Defendant MetLife to CRA Defendant Experian.

41.    On March 24, 2010: Plaintiff White received a notice from CRA Experian regarding its investigation into the dispute raised in February by Plaintiff White, claiming that Experian contacted Defendants First Horizon/MetLife and that Defendants First Horizon/MetLife had "verified" that the information provided was accurate; under Experian's policies, if, upon Experian's "investigation" of a consumer's challenge to the accuracy of reported information, the disputed information is "verified" as "accurate" by a creditor, Experian will not note the consumer's dispute in the credit report.

42.    As Plaintiff White persevered in his efforts to make contact with a person of authority at Defendant MetLife he also persevered in his effort seek alternate employment opportunities that would provide additional income. He received a written job offer in March 2010 for a government position that would have improved his financial situation, conditioned on an extensive background investigation. He had undergone background investigations in the past and been cleared at the top levels but he was gravely concerned about the impact on the opportunity due to  the First Horizon/ MetLife dispute, as he had warned about to MetLife, Radian and Experian. (Exhibit 1, ¶27).

43.     On April 19, 2010 Plaintiff White received notice from Defendants First Horizon/MetLife dated April 14, 2010 of an impending transfer to LBPS. The transfer was to occur on May 01, 2010.

44.     Despite the notice of transfer claiming that the loan service would transfer on May 01, 2010, Defendant MetLife issued a statement of account date May 04, 2010, after alleged transfer date.

45.     On May 20, 2010, Plaintiff White received a notice from LBPS dated May 11, 2010 of the transfer of the Loan servicing to Defendant LBPS, also alleging the transfer date was May 15, 2010.

46.     Upon information and belief, Defendant LBPS is Defendants First Horizon/MetLife's successor-in-interest under the Loan Documents and TPP. If Defendant LBPS is indeed Defendants First Horizon/ MetLife's legal successor-in-interest, Defendants First Horizon, MetLife and LBPS are jointly and severally liable to perform under the terms of the Loan Documents and TPP; therefore, at times they are hereinafter referred to jointly as "Defendants First Horizon/Defendant MetLife/LBPS." Plaintiff White has no knowledge as to whether Defendant LBPS was or is a qualified HAMP servicer.

47.     The LBPS notice of transfer contained inaccurate information concerning the amount of "unpaid interest" because the interest was calculated under the terms of the Loan prior to the TPP of June 2, 2009 and because Plaintiff White's TPP payments had not been fully credited to the balance. On June 8, 2010 Plaintiff White sent a "qualified written request" to Defendant LBPS in response to the notice of transfer.

48.    On May 5, 2010, before Plaintiff White received Defendant LBPS's notice of transfer, Plaintiff White received a telephone call from Defendants First Horizon/Defendant MetLifes' representative "Eric" at phone number 1-800-364-7662, ext. 3805. "Eric" knew nothing about the TPP, the credit dispute nor an alleged loan service transfer to Defendant LBPS; the stated purpose of Eric's contact with Plaintiff White was in regard to collection of "past due" payments Eric alleged were owed to Defendants First Horizon/Defendant MetLife.

49.    Eric claimed Plaintiff White owed Defendants First Horizon/Defendant MetLife past due amounts of the original Loan monthly payments ($3588.14) back to the pre-TPP period. When Plaintiff White informed Eric of the TPP and PM and Plaintiff White's continuing attempts to enforce the TPP, Eric stated that he had no record of the TPP or the history of Plaintiff White's credit complaints issued to Defendants First Horizon/MetLife by Plaintiff White, Experian and Radian. Eric requested that Plaintiff White "resend" all written documentation of the history of the Loan modification and credit report dispute.

50.    Eric's lack of knowledge, confusion, and the many inconsistencies and inaccuracies of the correspondence from Defendants First Horizon/Defendant MetLife and LBPS was extremely alarming, frustrating and distressing to Plaintiff White; it was apparent that there was mass confusion and breakdown among Defendants MetLife and LBPS. Plaintiff White felt an alarming threat to the security of his residence, his children, his career as well as his professional and personal reputation.

51.      Plaintiff White, relying on Eric's information that Defendants First Horizon/MetLife was still servicing the Loan and that Eric would follow up on Plaintiff White's dispute and requests for assistance, faxed <u>another</u> package to Defendants First Horizon/MetLife ("Attn: Eric"), including copies of the TPP, all post-TPP correspondence re the debacle, the credit dispute, Radian Financial Statement and Radian Package.

52.      On May 24, 2010 Plaintiff White received a letter dated May 5, 2010 from LBPS entitled "Notice of Default." On May 31, 2010 Plaintiff White received another letter from LBPS dated May 24, 2010 (the same date as the Notice of Default) expressing interest in "working with you to resolve the delinquency" of the Loan, outlining options and procedures, including an instruction to telephone LBPS.

53.      Plaintiff White followed instructions and called the LBPS telephone number and was told (<u>again</u>) to submit financial information which he had just sent by Federal Express to Defendants First Horizon/MetLife two weeks earlier.

54.      On June 8, 2010, in response to the May 11 LBPS notice of transfer containing inaccurate information, and LBPS's subsequent telephone instruction to submit an LBPS Financial Statement, Plaintiff White sent a "qualified written request" ("QWR") to LBPS itemizing the inaccuracies in the notice of transfer and including a "LBPS Financial Statement" (as instructed by LBPS in the phone call on May 31, 2010). LBPS listed the total amount due as $417,375.77. An amount that was $20,375.71 more than the original note for the Loan. LBPS failed to issue an "acknowledgement" of receipt of the QWR within 20 days.

55.   On June 25, 2010 Plaintiff White received a letter from LBPS dated June 21, 2010 that contained the statement: "The welcome package that we sent you in May contained an incorrect creditor name. The creditor for your mortgage is Fannie Mae. LBPS is the servicer and is authorized to accept payments from you on behalf of Fannie Mae, your creditor."   The letter further illustrating the continued confusion maintained and perpetuated by Defendants First Horizon/Defendant MetLife and LBPS over the responsibility, management and control of the mortgage functions.

56.   On July 26, 2010 Plaintiff White received a letter from Defendant LBPS dated July 20, 2010 denying Plaintiff White's June 04, 2010 modification request letter. The letter did not provide a specific reason for denial; again, Defendant LBPS ignored Plaintiff White's QWR, credit dispute and attempts to enforce the TPP to obtain the PM.

57.   On July 30, 2010, Plaintiff White received a formal "invitation" post marked July 22, 2010 to contact LBPS by phone or online to discuss workout options. The "invitation" instructed Plaintiff White to register online for assistance. Plaintiff White complied with the instructions, registered online, and <u>once more</u> submitted financial statements, etc.   The Invitation stated, "*A professional, trained and friendly representative is waiting for your call. . ..*" and "[*W*]*e want you to know you do have options and if possible we want to work out a plan with you [to] ...stay in your home. . give you peace of mind. . .[and]. . .if you can make payments, even if you can't bring your loan completely current right away, we may be able to help you with a forbearance agreement or loan modification.*"(LBPS Invitation, Exhibit 28). In the Invitation LBPS

promised to respond to all invitation responses within 10 days. Mr. White immediately responded to the "invitation" online, however, LBPS did not respond within 10 days.

58.    Instead, on August 02, 2010 Plaintiff White received another letter from LBPS dated July 22, 2010, again inviting Plaintiff White to contact LBPS to discuss loan workout options. Again, even though LBPS was in possession of and had actual knowledge of Plaintiff White's highly documented historic credit dispute with Defendants First Horizon/MetLife and LBPS, LBPS ignored Plaintiff White's QWR, credit dispute or attempts to enforce the TPP to obtain the PM.

59.    On August 08, 2010 Plaintiff White reviewed his credit report and saw that false and inconsistent information reported by Defendant First Horizon/Defendant MetLife had not been corrected or reported in dispute.

60.    On August 09, 2010, Plaintiff White again notified CRA Experian that Defendants First Horizon/ MetLife continued to report false information to Experian; Experian issued a response to Plaintiff White stating that it had already investigated Plaintiff White's complaint and "verified that it the information is correct" and that if Plaintiff White wants to contest it he must submit additional information to Experian. The Experian report revealed inaccurate, inconsistent and nonsensical information concerning the Loan, (Experian Report, 12 and 15).

61.    On August 13, 2010: Plaintiff White received a letter from LBPS dated August 08, 2010 stating, "We are pleased you have contacted us requesting assistance on your loan." LBPS discussed several "workout" options and again requested documentation from Plaintiff White. Again LBPS ignored Plaintiff White's QWR, credit

dispute, and attempts to enforce the TPP to obtain the PM. The August 08 LBPS letter contains no reference to LBPS's previous denial issued only three weeks earlier on July 20, 2010.

62.    On the same date (August 13, 2010) Plaintiff White received at the Residence, by certified mail, return receipt signed, a Notice of Trustee's Sale from TD Services Company ("TD") (as purported "substitute trustee" of the Deed of Trust) with an attached cover letter dated August 6, 2010. The cover letter contains inaccurate information about the Loan amounts and past-due payments.

63.    On the same date, (August 13, 2010), Plaintiff White received a second letter received by certified mail, return receipt signed, also dated August 06, 2010 from TD, again announcing a foreclosure proceeding, however this letter is on different letterhead and from a different TD department.

64.    On August 20, 2010 Plaintiff arrived home to find a copy of the Notice of Trustee's Sale conspicuously taped to the front door of his home. All three Notices of Trustees Sale provide an LBPS phone number to call for "information:" when Mr. White called the number, a recording instructed callers to "enter the extension of the party you are calling." Plaintiff White knew of no extension number so, of course, could not obtain "information" as represented in the Notice of Trustee's Sale.

65.    Thereafter, Plaintiff White retained counsel who sent joint certified demand letter to the Arizona statutory agents of  Defendants LBPS and First Horizon, and to the an Indiana address posted on the website of  MetLife: the letter was addressed to the "Legal Departments" of the listed entities.

66.     LBPS responded with a letter dated September 1, 2010 from the "Correspondent Response Team" with only "866" number on its letterhead and underlined again requesting financial information from Plaintiff White which he had already sent several times earlier in the previous month. The letter stated, "We will suppress future credit reporting until this is resolved.  ...In the meantime your client is welcome to offer this letter as acknowledgement of his dispute regarding the existing credit reporting."

67.     On September 19, 2010 Plaintiff White's Experian report show that LBPS had violated it's written promise to Plaintiff's counsel in the September 1 letter to "suppress future credit reporting" and that instead, after the September 1 letter had been sent, LBPS furnished inaccurate and derogatory information to Experian concerning Plaintiff White.  The report now showed a "Past Due Amount" of $39,970.00 and a notation of "Foreclosure Proceeding Started" under a LBPS account heading.

68.     The current market value of the Residence according to a current unofficial Zillow.com survey (September 22, 2010) is three hundred one thousand dollars ($301,000.00).

69.     Defendant Fannie Mae, as principal, gave express or apparent authority to Defendant LBPS to act as Defendant Fannie Mae's agent on matters relating to the Loan Documents. In the alternative, if no express agency agreement exists between Defendants Fannie Mae and LBPS, Defendant LBPS has apparent authority to act on Defendant Fannie's Mae's behalf in relation to the Loan Documents and Defendant Fannie Mae has ratified that apparent authority. As a result of the principal-agent relationship between Defendants Fannie Mae and LBPS, the actions of Defendant LBPS conducted within the

scope of its duties in relation to the Loan Documents are attributable to Defendant Fannie Mae, and Defendant Fannie Mae's actions conducted within the scope of its duties in relation to the Loan Documents are attributable to Defendant LBPS.

70.    Upon information and belief, Defendant Fannie Mae is the successor-in-interest and assignee of Defendant MetLife with respect to Plaintiff White's Loan and Defendant MetLife is the successor-in-interest and assignee of Defendant First Horizon with respect to the Plaintiff's Loan. Therefore, Defendant MetLife is liable for the actions and obligations of Defendant First Horizon, and Defendant Fannie Mae is liable for the actions and obligations of Defendant MetLife (including Defendant MetLife's liability for the actions and obligations for Defendant First Horizon's actions and obligations).

71.    Upon information and belief, Defendant LBPS is the successor-in-interest and assignee of Defendant MetLife with respect to loan servicing of Plaintiff White's Loan, and Defendant MetLife is the successor-in-interest and assignee of Defendant First Horizon with respect to the Plaintiff's Loan. Therefore, Defendant LBPS is liable for the actions and obligations of Defendant MetLife (including Defendant MetLife's liability for the actions and obligations for Defendant First Horizon's actions and obligations).

## COUNT ONE
## (BREACH OF CONTRACT)

72.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

73.    First Horizon made an offer to Plaintiff White to enter into the TPP and Plaintiff White accepted. There was valid mutual consideration and the TPP is a validly formed contract.

74.     Plaintiff White performed all conditions precedent to Defendant First Horizon's obligation to perform under the TPP. Defendant MetLife ratified the TPP by its actions and offered to extend the TPP period and represented that it would honor the obligations to provide the permanent loan modification as required in the TPP. Plaintiff accepted the offer to extend and continued making TPP payments according to the instruction terms of Defendant MetLife.

75.     Defendants First Horizon and MetLife breached the TPP and the extension of the TPP agreement by failing to provide a permanent loan modification.

76.     Plaintiff White has suffered damage as a result of Defendants First Horizon and MetLife's breaches.

77.     Defendants Fannie Mae is the successors-in-interest and assignees of Defendant MetLife with respect to Plaintiff White's Loan, and Defendant MetLife is the successor-in-interest and assignee of Defendant First Horizon with respect to the Plaintiff's Loan. Defendants Fannie Mae is the successors-in-interest and assignees of Defendant MetLife with respect to Plaintiff White's Loan.

78.     Defendant Fannie Mae breached the TPP agreement by failing to provide a permanent loan modification.

79.     Defendants First Horizon, MetLife and Fannie Mae may are jointly and severally liable to Plaintiff White for damages suffered as a result of the Defendants' breaches.

80.     Defendant LBPS, as the successor-in-interest and assignee of Defendant MetLife, and the agent of Defendant Fannie Mae, is liable for the acts and obligations of Defendants MetLife and Defendant Fannie Mae under this claim.

WHEREFORE, Plaintiff demands Judgment against Defendants, and each of them, as follows:

a.     A preliminary injunction enjoining Defendants Fannie Mae and LBPS from proceeding with the scheduled trustee's sale pending the outcome of a final decision in this action on the merits of Plaintiff White's common law claims;

b.     An Order for specific performance of requiring Defendants Fannie Mae and LBPS to honor take action to enforce and perform the contractual obligation of Fannie Mae to enter into a permanent loan modification with Plaintiff White;

c.     Compensatory damages in an the amount to be proven at trial (significantly greater than the jurisdictional minimum of seventy five thousand dollars ($75,000));

d.     Attorneys' fees and costs of suit as provided by A.R.S. §12-341.01;

e.     For such other relief as the evidence supports or as this Court deems just.

**COUNT TWO**
**(PROMISSORY ESTOPPEL)**

81.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

82.    Defendant First Horizon made promises under the TPP to provide a PM; Defendant MetLife ratified the TPP and made repeated verbal promises to provide a PM, Defendant MetLife promised to report and investigate Plaintiff White's credit information.

83.    Plaintiff White reasonably and justifiably was induced by and relied upon Defendant First Horizon/MetLife's promises.

84.    It was reasonably foreseeable to Defendants First Horizon/MetLife that their promises would induce reliance on Plaintiff White's part;

85.    As a result of Defendants First Horizon's and MetLife's actions Plaintiff White incurred damages and loss and suffered detriment.

86.    Defendant Fannie Mae, as the successor-in-interest and assignee of Defendant MetLife, liable for the acts and obligations of Defendants MetLife under this claim, including Defendant MetLife's liabilities for the actions and obligations of Defendant First Horizon. Defendants First Horizon, MetLife and Fannie Mae are jointly and severally liable to Plaintiff White for damages and detriment suffered as a result of Defendants First Horizon's and MetLife's actions under this claim. Defendant LBPS, as the successor-in-interest and assignee of Defendant MetLife, and the agent of Defendant Fannie Mae, is liable for the acts and obligations of Defendants MetLife and Defendant Fannie Mae under this claim.

WHEREFORE, Plaintiff demands Judgment against Defendants, and each of them, as follows:

a.     A preliminary injunction enjoining Defendants Fannie Mae and LBPS from proceeding with the scheduled trustee's sale pending the outcome of a final decision in this action on the merits of Plaintiff White's common law claims;

b.     An Order for specific performance of requiring Defendants Fannie Mae and LBPS to honor take action to enforce and perform the contractual obligation of Fannie Mae to enter into a permanent loan modification with Plaintiff White;

c.     Compensatory damages in an the amount to be proven at trial (significantly greater than the jurisdictional minimum of seventy five thousand dollars ($75,000));

d.     Attorneys' fees and costs of suit as provided by A.R.S. §12-341.01;

e.     For such other relief as the evidence supports or as this Court deems just.

**COUNT THREE**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

87.     Defendants First Horizon, MetLife and Fannie Mae have had or do have contractual a relationship with and obligations to Plaintiff White under the Loan Documents and the TPP;

88.     Defendants is obligated by the common law implied covenant of good faith and fair dealing to act in good faith and to deal fairly with Plaintiff White;

The purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.

89.     Defendants breached this duty by their actions as alleged above in the Factual Background and generally as follows: failure to honor the express intent of the TPP to provide a permanent loan modification; predatory lending and mortgage servicing practices by stonewalling, providing rolling assurances and failing to act on them; gross negligence in their business operations with respect to processing loan modifications; failure to disclose information about HAMP that they now claim was material to their performance obligation under the TPP; and violations of FCRA and RESPA.

90.     These actions constitute bad faith by the Defendant.

91.     As a result of Defendants First Horizon's and MetLife's actions, Plaintiff White has been damaged.

92.     Defendant Fannie Mae, as the successor-in-interest and assignee of Defendant MetLife Defendants First Horizon, MetLife and Fannie Mae are jointly and severally liable to Plaintiff White for damages and detriment suffered as a result of Defendants First Horizon's and MetLife's actions under this claim. Defendant LBPS, as the successor-in-interest and assignee of Defendant MetLife, and the agent of Defendant Fannie Mae, is liable for the acts and obligations of Defendants MetLife and Defendant Fannie Mae under this claim.

WHEREFORE, Plaintiff demands Judgment against Defendants, and each of them, as follows:

a.      A preliminary injunction enjoining Defendants Fannie Mae and LBPS from proceeding with the scheduled trustee's sale pending the outcome of a final decision in this action on the merits of Plaintiff White's common law claims;

b.      An Order for specific performance of Defendant's contractual obligations together under the TPP;

c.      Compensatory damages in an the amount to be proven at trial however significantly greater than the jurisdictional minimum seventy five thousand dollars ($75,000);

d.      Punitive and Exemplary damages under common law claims for breach of implied covenant of good faith and fair dealing;

e.      Attorneys' fees and costs of suit as provided by A.R.S. §12-341.01.

f.      For such other relief as the evidence supports or as this Court deems just.

**COUNT FOUR**
**(Violations of Fair Credit Reporting Act**
**15 U.S.C. §1681 *et seq.*)**

93.      Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

94.      Defendants First Horizon, MetLife and Defendants LBPS are "furnishers of information" under the FCRA. Plaintiff White is a "consumer" under the FCRA.

95.      The following actions constitute violations by furnishers of information under the FCRA:

a.      §1681s (a) (1) (A): furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate;

b.     §1681s (a) (1) (B) willful failure to report to a credit reporting agency that information previously furnished is inaccurate.  After furnisher  has been notified by the consumer, that specific information is inaccurate;

c.     §1681s (a) (1)  (2) (B) willful failure to any corrections to previously provided information, or any additional information, that is necessary to make the information provided by the person to the agency complete and accurate; and

d.     §1681s (a) (1)    (3) willful failure, after consumer has disputed information previously-furnished to credit reporting agencies by furnisher, to provide notice to credit reporting agency that the information is disputed by the consumer.

96.     Defendants First Horizon and LBPS violated FCRA §1681s (a) (1) (A); §1681s (a) (1) (B); §1681s (a) (1)  (2) (B);  and §1681s (a) (1)(3) by willfully furnishing information to credit reporting agencies that they knew or reasonably should have known was inaccurate or incomplete, and by failing, after being notified by Plaintiff White that the furnished information was in dispute, to provide furnish correct and complete information and to report that Mr. White disputed the information.

97.     Defendant MetLife violated FCRA §1681s (a) (1) (3) by failing, after being notified by Plaintiff White that the furnished information was in dispute, to provide furnish correct and complete information and to report that Mr. White disputed the information.

98.     As a direct and proximate result of Defendants First Horizon's, MetLife's and LBPS's above-listed violations of FCRA, Plaintiff has suffered damages.

99.     Defendant Fannie Mae, as LBPS's principal, is liable for Defendant LBPS's actions and failures to act in violation of the FCRA.

100.    Under FCRA §1681n Plaintiff White has a private right of action against Defendants First Horizon, MetLife, LBPS and Fannie Mae is entitled to recover damages from each of them as follows: under §1681n (1) (A) actual damages; or under §1681n (1) (2) such amount of punitive damages as the court may allow; and under §1681n (1) (3) the costs of the action together with reasonable attorney's fees as determined by the court.

WHEREFORE, Plaintiff demands Judgment against Defendants, and each of them, as follows:

a.      Injunctive relief enjoining Defendants from reporting to credit reporting agencies inaccurate information and requiring them to remove all previously furnished derogatory information concerning Plaintiff White's credit information or to report to credit reporting agencies that the information is in dispute.

b.      Statutory damages and punitive damages as provided by the FCRA;

c.      Attorneys' fees and costs of suit as provided by FCRA

d.      For such other relief as the evidence supports or as this Court deems just.

//

## COUNT FIVE

**(Violations of Real Estate Settlement Procedures Act, 12 U.S.C. § 2605 *et seq*. ("RESPA") §3500.21 Mortgage servicing transfers notice requirements)**

101.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

102.    Upon information and belief, on May 15, 2010, Defendant MetLife transferred its interests and obligations as the servicer of Plaintiff White's Loan to Defendant LBPS (the "Transfer").

103.    At the time of the Transfer, Defendant MetLife was a "transferor servicer" and Defendant LBPS was a "transferee servicer" under the definitions contained in 12 USC §3500.21. Plaintiff White was a "consumer"/"borrower" under RESPA definitions.

104.    Under 12 USC §3500.21 (d) (1), Defendant MetLife, as transferor, servicer, and Defendant LBPS, as transferee servicer, were required to deliver written "Notice of Transfer" to Plaintiff White.

105.    Under 12 USC §3500.21 (d) (2) (A) the transferor servicer must deliver its notice to the borrower not less than 15 days before the effective date of the transfer, and under 12 USC §3500.21 (d) (2)(B) the transferee servicer must deliver the notice to the borrower not more than 15 days after the effective date of the transfer.

106.    Defendants MetLife and LBPS violated RESPA notice of mortgage servicing requirements by failure to follow the "time of notice" requirements in accordance with 12 USC §3500.21 (d) (2) (A) and (B).

107.     As a direct and proximate result of Defendants MetLife's and LBPS's respective violations of 12 USC §3500.21 (d) (2) (A) and (B), Plaintiff has suffered damages.

108.     Defendant Fannie Mae, as LBPS's principal, is liable for Defendant LBPS's actions and the failures to act in violation of RESPA.

109.     Under 12 USC §3500.21, Plaintiff White has a private cause of action against Defendants MetLife and LBPS and is entitled to recovery of his actual damages, the costs of this action and any reasonable attorneys' fees incurred in connection with the action; and, if discovery reveals a pattern or practice of noncompliance with RESPA transfer notice requirements on the part of Defendants MetLife or LBPS, Plaintiff White is entitled to additional damages in an amount not to exceed $1,000.

WHEREFORE, Plaintiff demands Judgment against Defendants MetLife, LBPS and Fannie Mae, and each of them, as follows:

a.     Statutory and punitive damages pursuant to RESPA;

b.     Attorneys' fees and costs of suit as provided by and RESPA;

c.     For such other relief as the evidence supports or as this Court deems just.

//

**COUNT SIX**

**(Violations of Real Estate Settlement Procedures Act, 12 U.S.C.
§ 2605 *et seq*. ("RESPA") § 3500.21 requirements for responses to qualified written requests)**

110.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

111.   Defendant LBPS is a mortgage servicer and Plaintiff White is a consumer/borrower under 12 USC §3500 (RESPA). Under 12 USC §3500.21 (e) (2) a "qualified written request means a written correspondence . . .that includes. . .the name and account of the borrower. . . a statement of the reasons that the borrower believes the account is in error . . .or. . .provides sufficient detail to the servicer regarding information relating to the servicing of the loan sought by the borrower."

112.   On June 4, 2010, Plaintiff White sent a qualified written request to Defendant LBPS including a statement of the reasons that he believed his Loan service account was in error.

113.   Under  12 USC §3500.21(e) (1), Defendant LBPS was required to provide Plaintiff White a written response acknowledging receipt of the qualified written response within 20 business days of receiving Plaintiff White's  qualified written request.

114. Defendant LBPS violated 12 USC §3500.21(e)(3)(ii) by failing, within 60 days of receiving Plaintiff White's qualified written request to conduct an investigation and provide Plaintiff White with a written statement of the it's reasons for concluding the

account is correct and the name and telephone number of an employee, office, or department of the servicer that can provide assistance to the borrower.

115. As a direct and proximate result of Defendants LBPS's violations of 12 USC §3500.21 (d) (2) (A) and (B), Plaintiff has suffered damages.

116.  Defendant Fannie Mae, as LBPS's principal, is liable for Defendant LBPS's actions and failures to act in violation of the FCRA.

117.  Under 12 USC §3500.21, Plaintiff White has a private cause of action and is entitled to recovery of his actual damages, the costs of this action and any reasonable attorneys' fees incurred in connection with the action; and, if discovery reveals a pattern or practice of noncompliance with RESPA qualified written request requirements on the part of Defendant LBPS, Plaintiff White is entitled to additional damages in an amount not to exceed $1,000.

WHEREFORE, Plaintiff demands Judgment against Defendants LBPS and Fannie Mae, and each of them, as follows:

a.  Statutory damages punitive and damages as provided by RESPA;

b.  Attorneys' fees and costs of suit as provided by RESPA; and

c.  For such other relief as the evidence supports or as this Court deems just.

//

**DEMAND FOR JURY TRIAL**

118.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby

demand a jury trial.

DATED October 14, 2010.

PAMELA A.  COVELLA

/s/ Pamela Covella
Attorney for Plaintiff